UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
                                )
FRANK T. DIXON; DEANA M. DIXON, )
                                )
                 Plaintiffs,    )
                                )
          v.                    )   CIVIL ACTION
                                )   NO. 11-10368-WGY
WELLS FARGO BANK, N.A. formerly )
known as WACHOVIA MORTGAGE, FSB )
formerly known as WORLD SAVINGS )
BANK, FSB,                      )
                                )
                 Defendant.     )
_____)
```

MEMORANDUM AND ORDER

YOUNG, D.J.                                    July 22, 2010

## I.   INTRODUCTION

Frank and Deana Dixon (collectively "the Dixons") bring this
cause of action against Wells Fargo Bank, N.A. ("Wells Fargo"),
seeking (1) an injunction prohibiting Wells Fargo from
foreclosing on their home; (2) specific performance of an oral
agreement to enter into a loan modification; and (3) damages.
Wells Fargo, having removed the action from state court, now
moves for dismissal of the Dixons' complaint under Fed. R. Civ.
P. 12(b)(6), arguing that the allegations are insufficient to
invoke the doctrine of promissory estoppel and that, to the
extent the Dixons have stated a state-law claim, it is preempted

by the Home Owners' Loan Act ("HOLA"), 12 U.S.C. §§ 1461-1700,
and its implementing regulations, 12 C.F.R. §§ 500-99.

**A.   Procedural History**

On January 6, 2011, the Dixons initiated this civil action
in the Massachusetts Superior Court sitting in and for the County
of Plymouth, Civil Docket No. PLCV2011-00015, by filing a
"Verified Complaint for Injunctive Relief, Specific Performance
and Damages."  Compl., Ex. A, ECF No. 1-1; Summons & Order
Notice, Ex. D, ECF No. 1-4.  They also filed an ex parte motion
for a temporary restraining order.  TRO, Ex. B, ECF No. 1-2.
After an initial continuance, the hearing on that motion was held
on February 14, 2011, and the Superior Court issued a preliminary
injunction, enjoining Wells Fargo from prosecuting the
foreclosure action it had filed against the Dixons until further
order of the court.  Sup. Ct. Civ. Dkt. 3-4, Ex. C, ECF No. 1-3;
Order Prelim. Inj., ECF No. 4.  At the present time, the
preliminary injunction remains in effect.  Mem. Opp'n Pls.' Mot.
Remand 1, ECF No. 13.

On March 4, 2011, Wells Fargo removed the action to the
United States District Court for the District of Massachusetts.
Notice Removal, ECF No. 1.  Wells Fargo filed its motion to
dismiss the Dixons' complaint on April 11, 2011.  Def.'s Mot.
Dismiss, ECF No. 5; Mem. Supp. Def.'s Mot. Dismiss ("Def.'s Mem.
Supp."), ECF No. 7.  The Dixons opposed Wells Fargo's motion and

moved to remand the case. Mem. Opp'n Def.'s Mot. Dismiss ("Pls.'
Mem. Opp'n"), ECF No. 12; Pls.' Mot. Remand, ECF No. 9; Mem.
Supp. Pls.' Mot. Remand, ECF No. 10.

After a hearing on May 9, 2011, this Court denied the
Dixons' motion to remand and granted Wells Fargo's motion to
dismiss the Dixons' contract claim as insufficiently pleaded.
The Court took under advisement the two remaining issues: (1) the
sufficiency of the allegations in the complaint with respect to
the doctrine of promissory estoppel; and (2) HOLA preemption.
With leave of the Court, both parties have since filed
supplemental briefing. Supplemental Mem. Supp. Def.'s Mot.
Dismiss ("Def.'s Supplemental Mem. Supp."), ECF No. 16;
Supplemental Mem. Opp'n Def.'s Mot. Dismiss ("Pls.' Supplemental
Mem. Opp'n"), ECF No. 18.

### B. Facts Alleged

The Dixons reside at their home in Scituate, Plymouth
County, Massachusetts. Compl. ¶ 2. Wells Fargo is a corporation
doing business in the Commonwealth of Massachusetts. Id. ¶ 3.
Wells Fargo alleges that it is the holder of a mortgage on the
Dixons' home. Id. ¶ 6.

On or about June 8, 2009, the Dixons orally agreed with
Wells Fargo to take the steps necessary to enter into a mortgage
loan modification. Id. ¶ 7. As part of this agreement, Wells
Fargo instructed the Dixons to stop making payments on their

loan.  Id.  It was contemplated that the unpaid payments would be added to the note as modified.  Id.  In addition, Wells Fargo requested certain financial information, which the Dixons promptly supplied.  Id.

Notwithstanding the Dixons' diligent efforts and reliance on Wells Fargo's promise, Wells Fargo has failed, and effectively refused, to abide by the oral agreement to modify the existing mortgage loan.  Id. ¶ 8.

On or about December 8, 2010, the Dixons received notice from the Massachusetts Land Court that Wells Fargo was proceeding with a foreclosure on their home.  Id. ¶ 9.  The return date on the order of notice in the Land Court was January 10, 2011, and so the Dixons sought a temporary restraining order in the Superior Court to prevent the loss of their home.  See Procedural History, supra.

The Dixons state that, on information and belief, the fair market value of their home is in excess of the mortgage loan balance and any arrearage.  Compl. ¶ 10.

## II.  ANALYSIS

The Dixons seek to enforce Wells Fargo's alleged promise to engage in negotiating a loan modification.  See Pls.' Supplemental Mem. Opp'n 1-2.  Arguing that the bank's initiation of foreclosure proceedings without warning shows its promise to consider their eligibility for a modification was insincere, the

4

Dixons ask not only that the foreclosure be halted but also that Wells Fargo be returned to its place at the bargaining table. See id.; see also Pls.' Mem. Opp'n 7-8, 11-12. Wells Fargo contends that (1) any promise it made to consider the Dixons for a loan modification was not sufficiently definite as to be binding, see Def.'s Supplemental Mem. Supp. 1; (2) the Dixons' reliance on its promise was neither reasonable nor detrimental, see Def.'s Mem. Supp. at 17-19; and (3) in any event, the claim for promissory estoppel is preempted by federal law, see id. at 8-14.

### A.   Legal Standard

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In addition to accepting all factual allegations in the complaint as true, the Court must draw all reasonable inferences in the plaintiff's favor. Langadinos v. American Airlines, Inc., 199 F.3d 68, 69 (1st Cir. 2000). If the facts in the complaint are sufficient to state a cause of action, a motion to dismiss the complaint must be denied. See Nollet v. Justices of Trial Courts of Mass., 83 F. Supp. 2d 204, 208 (D. Mass. 2000) (Harrington, J.).

Although the Court must accept as true all of the factual allegations contained in the complaint, that doctrine is not

applicable to legal conclusions.  <u>Ashcroft</u> v. <u>Iqbal</u>, 129 S. Ct.
1937, 1949 (2009).  Threadbare recitals of the legal elements,
supported by mere conclusory statements, do not suffice to state
a cause of action.  <u>Id.</u>  Accordingly, a complaint does not state
a claim for relief where the well-pleaded facts fail to warrant
an inference of anything more than the mere possibility of
misconduct.  <u>Id.</u> at 1950.

**B.   Promissory Estoppel**

The gravamen of the Dixons' complaint is that Wells Fargo
promised to engage in negotiations to modify their loan, provided
that they took certain "steps necessary to enter into a mortgage
modification."  Compl. ¶ 7.  On the basis of Wells Fargo's
representation, the Dixons stopped making payments on their loan
and submitted the requested financial information – only to learn
subsequently that the bank had initiated foreclosure proceedings
against them.  They contend that Wells Fargo ought have
anticipated their compliance with the terms of its promise to
consider them for a loan modification.  Not only was it
reasonable that they would rely on the promise, but also their
reliance left them considerably worse off, for by entering into
default they became vulnerable to foreclosure.

The question whether these allegations are sufficient to
state a claim for promissory estoppel requires a close look at
the doctrine's evolution in the law of Massachusetts.  In

Loranger Const. Corp. v. E.F. Hauserman Co., 376 Mass. 757
(1978), the Supreme Judicial Court recognized the enforceability
of a promise on the basis of detrimental reliance, but declined
to "use the expression 'promissory estoppel,' since it tends to
confusion rather than clarity." Id. at 760-61. The court
reasoned that "[w]hen a promise is enforceable in whole or in
part by virtue of reliance, it is a 'contract,' and it is
enforceable pursuant to a 'traditional contract theory'
antedating the modern doctrine of consideration." Id. at 761.
Since Loranger, the court has adhered to its view that "an action
based on reliance is equivalent to a contract action, and the
party bringing such an action must prove all the necessary
elements of a contract other than consideration." Rhode Island
Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 850 (1995).

    "An essential element in the pleading and proof of a
contract claim is, of course, the 'promise' sought to be
enforced." Kiely v. Raytheon Co., 914 F. Supp. 708, 712 (D.
Mass. 1996) (O'Toole, J.). Thus, even where detrimental reliance
acts as a substitute for consideration, the promise on which a
claim for promissory estoppel is based must be interchangeable
with an offer "in the sense of 'commitment.'" Cataldo Ambulance
Servs., Inc. v. City of Chelsea, 426 Mass. 383, 386 n.6 (1998).
The promise must demonstrate "an intention to act or refrain from
acting in a specified way, so as to justify a promisee in

7

understanding that a _commitment_ has been made." _Varadian_, 419
Mass. at 849-50 (quoting Restatement (Second) of Contracts § 2
(1981)). That the representation is of future, rather than
present, intention will not preclude recovery, so long as the
promisor's expectation to be legally bound is clear. _See_
_Sullivan_ v. _Chief Justice for Admin. & Mgt. of Trial Court_, 448
Mass. 15, 28 & n.9 (2006) (quoting _Boylston Dev. Group, Inc._ v.
_22 Boylston St. Corp._, 412 Mass. 531, 542 n.17 (1992)).

In addition to demonstrating a firm commitment, the putative
promise, like any offer, must be sufficiently "definite and
certain in its terms" to be enforceable. _Moore_ v. _La-Z-Boy,_
_Inc._, 639 F. Supp. 2d 136, 142 (D. Mass. 2009) (Stearns, J.)
(quoting _Kiely_, 914 F. Supp. at 712). "[I]f an essential element
is reserved for the future agreement of both parties, as a
general rule, the promise can give rise to no legal obligation
until such future agreement." 1 Richard A. Lord, Williston on
Contracts § 4:29 (4th ed. 1990); _see_ _Lucey_ v. _Hero Int'l Corp._,
361 Mass. 569, 574-75 (1972). Under well-settled Massachusetts
law, "an agreement to enter into a contract which leaves the
terms of that contract for future negotiation is too indefinite
to be enforced." _Caggiano_ v. _Marchegiano_, 327 Mass. 574, 580
(1951); _see_ _Sax_ v. _DiPrete_, 639 F. Supp. 2d 165, 171 (D. Mass.
2009) (Stearns, J.); _Moore_, 639 F. Supp. 2d at 142; _In re Harvey_
_Probber, Inc._, 50 B.R. 292, 296-97 (Bankr. Mass. 1985); _Lafayette_

8

Place Assocs. v. Boston Redevelopment Auth., 427 Mass. 509, 517
(1998); Bell v. B.F. Goodrich Co., 359 Mass. 763, 763 (1971); Air
Tech. Corp. v. General Elec. Co., 347 Mass. 613, 626 (1964);
Rosenfield v. United States Trust Co., 290 Mass. 210, 217 (1935);
Restatement (Second) of Contracts § 33, comment (c) ("The more
terms the parties leave open, the less likely it is that they
have intended to conclude a binding agreement.").

The longstanding reluctance of courts to enforce open-ended
"agreements to agree" reflects a belief that, unless a "fall-back
standard" exists to supply the missing terms, there is no way to
know what ultimate agreement, if any, would have resulted.
E. Allan Farnsworth, Precontractual Liability and Preliminary
Agreements: Fair Dealing and Failed Negotiations, 87 Colum. L.
Rev. 217, 255-56 (1987). It is the vague and indefinite nature
of that potential final agreement - not the preliminary agreement
to agree - that troubles courts. See Armstrong v. Rohm & Haas
Co., Inc., 349 F. Supp. 2d 71, 78 (D. Mass. 2004) (Saylor, J.)
(holding that an agreement must be sufficiently definite to
enable courts to give it an exact meaning). Judges are
justifiably unwilling to endorse one party's aspirational view of
the terms of an unrealized agreement. See Farnsworth, supra at
259. Just as "[i]t is no appropriate part of judicial business
to rewrite contracts freely entered into," RCI Northeast Servs.
Div. v. Boston Edison Co., 822 F.2d 199, 205 (1st Cir. 1987),

courts must not force parties into contracts into which they have
<u>not</u> entered freely, <u>Armstrong</u>, 349 F. Supp. 2d at 80 (holding a
promise unenforceable where the court could not "supply the
missing terms without 'writing a contract for the parties which
they themselves did not make'" (quoting <u>Held</u> v. <u>Zamparelli</u>, 13
Mass. App. Ct. 957, 958 (1982))).

Moreover, parties ought be allowed to step away unscathed if
they are unable to reach a deal. <u>Cf.</u> <u>R.W. Int'l Corp.</u> v. <u>Welch</u>
<u>Food, Inc.</u>, 13 F.3d 478, 484-85 (1st Cir. 1994). To impose
rights and duties at "the stage of 'imperfect negotiation,'"
<u>Lafayette Place Assocs.</u>, 427 Mass. at 517, would be to interfere
with the liberty to contract – or not to contract. Thus, the
concern is that if a court were to order specific performance of
an agreement to agree, where the material terms of the final
agreement were left open by the parties, not only would there be
"little, if anything, to enforce," <u>Lambert</u> v. <u>Fleet Nat'l Bank</u>,
449 Mass. 119, 123 (2007), but also future negotiations would be
chilled. <u>Cf.</u> <u>American Broad. Cos., Inc.</u> v. <u>Wolf</u>, 420 N.E.2d 363,
368-69 (N.Y. 1981) (denying request for specific performance of
general contract negotiation clause as inhibitive of free
competition).

Wells Fargo would have this Court end its inquiry here. The
complaint plainly alleges that the parties had an "agreement to
enter into a loan modification agreement," but as matter of law

"[a]n agreement to reach an agreement is a contradiction in terms and imposes no obligations on the parties thereto." Rosenfield, 290 Mass. at 217.  As such, the complaint would appear to fail to state a claim.

During the course of opposing Wells Fargo's motion to dismiss, however, the Dixons have made clear that they do not seek specific performance of a promised loan modification.  See Pls.' Supplemental Mem. Opp'n 1-2.  They admit that there was no guarantee of a modification by Wells Fargo, only a verbal commitment to determine their eligibility for a modification if they followed the bank's prescribed steps.  Thus, the Dixons' request that Wells Fargo be held to its promise to consider them for a loan modification is not a covert attempt to bind the bank to a final agreement it had not contemplated.  There is no risk that this Court, were it to uphold the promissory estoppel claim, would be "trapping" Wells Fargo into a vague, indefinite, and unintended loan modification masquerading as an agreement to agree.  Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 497 (S.D.N.Y. 1987).

Furthermore, because the parties had not yet begun to negotiate the terms of a modification, the Court questions whether Wells Fargo's promise ought even be characterized as a preliminary agreement to agree.  Instead, it more closely resembles an "agreement to negotiate."  See Farnsworth, supra at

263-69; cf. Aceves v. U.S. Bank, N.A., 120 Cal. Rptr. 3d 507, 514

(Cal. Ct. App. 2011) ("[T]he question here is simply whether U.S.

Bank made and kept a promise to negotiate with Aceves, not

whether . . . the bank promised to make a loan or, more

precisely, to modify a loan.").

To be sure, Massachusetts courts have tended to treat

agreements to negotiate as variants of open-ended agreements to

agree. The view that "[a]n agreement to negotiate does not

create a binding contract," Sax, 639 F. Supp. 2d at 171, again

reflects a concern that a promise of further negotiations is too

indefinite, too undefined in scope, to be enforceable. See Bell,

359 Mass. at 763 (finding an agreement to negotiate "for as long

as the parties agreed" to be "void for vagueness"). This is

particularly true where the parties have not specified the terms

on which they will continue negotiating. See Farnsworth, supra

at 264. Conventional wisdom holds that courts ought not

"strain[] to find an agreement to negotiate in the absence of a

clear indication of assent" by the parties to a governing

standard of conduct, e.g., "good faith" or "best efforts," id. at

266-67, because "there is no meaningful content in a general duty

to negotiate, standing alone," Steven J. Burton & Eric G.

Anderson, Contractual Good Faith § 8.4.2, at 361 (1995). See

Pinnacle Books, Inc. v. Harlequin Enters. Ltd., 519 F. Supp. 118,

122 (S.D.N.Y. 1981). As with open-ended agreements to agree,

judicial enforcement of vague agreements to negotiate would risk imposing on parties contractual obligations they had not taken on themselves.

In this case, Wells Fargo and the Dixons had not yet contemplated the terms of a loan modification, but they had contemplated negotiations. Their failure to elaborate on the boundaries of that duty to negotiate, however, would seem to militate against enforcement of it. Yet, Wells Fargo made a specific promise to consider the Dixons' eligibility for a loan modification if they defaulted on their payments and submitted certain financial information. See Burton & Andersen, supra § 8.2.2, at 332-33 (recognizing that, while there is no general duty to negotiate in good faith, public policy favors imposing noncontractual liability "when one person wrongfully harms another" by making a promise intended to induce reliance); Lucian Arye Bebchuk & Omri Ben-Shahar, Precontractual Reliance, 30 J. Legal Stud. 423, 424 (2001) ("A party may be liable for the other party's reliance costs on three possible grounds: if it induced this reliance through misrepresentation, if it benefited from the reliance, or if it made a specific promise during negotiations."); Farnsworth, supra at 236 (referring to the "specific promises that one party makes to another in order to interest the other party in the negotiations" as a "common basis for precontractual liability"). Importantly, it was not a

promise made in exchange for a bargained-for legal detriment, as there was no bargain between the parties; rather, the legal detriment that the Dixons claim to have suffered was a direct consequence of their reliance on Wells Fargo's promise. Joseph Perillo, Calamari & Perillo on Contracts § 6.1, at 218 (6th ed. 2009). Under the theory of promissory estoppel, "[a] negotiating party may not with impunity break a promise made during negotiations if the other party has relied on it." Farnsworth, supra at 236.

Promissory estoppel has developed into "an attempt by the courts to keep remedies abreast of increased moral consciousness of honesty and fair representations in all business dealings." Peoples Nat'l Bank of Little Rock v. Linebarger Constr. Co., 240 S.W.2d 12, 16 (Ark. 1951). While it began as "a substitute for (or the equivalent of) consideration" in the context of an otherwise binding contract, Perillo, supra § 6.1, at 218, "promissory estoppel has come to be a doctrine employed to rescue failing contracts where the cause of the failure is not related to consideration," id. § 6.3, at 229. It now "provides a remedy for many promises or agreements that fail the test of enforceability under many traditional contract doctrines," id. § 6.1, at 218, but whose enforcement is "necessary to avoid injustice," Restatement (Second) of Contracts § 90, comment (b).

Admittedly, the courts of Massachusetts have yet to formally

14

embrace promissory estoppel as more than a consideration

substitute.  See, e.g., Varadian, 419 Mass. at 850.  Nonetheless,

without equivocation, they have adopted section 90 of the

Restatement (Second) of Contracts, which reads, "A promise which

the promisor should reasonably expect to induce action or

forbearance on the part of the promisee or a third person and

which does induce such action or forbearance is binding if

injustice can be avoided only by enforcement of the promise."

See Chedd-Angier Prod. Co. v. Omni Publ'ns Int'l, Ltd., 756 F.2d

930, 937 (1st Cir. 1985); Loranger Constr. Corp., 376 Mass. at

760-61; McAndrew v. School Comm., 20 Mass. App. Ct. 356, 363

(1985); see also Anzalone v. Administrative Office of Trial

Court, 457 Mass. 647, 661 (2010) (using the term "promissory

estoppel" and defining estoppel similarly to the Restatement);

Sullivan, 448 Mass. at 27-28 (same).  Nowhere in the comments to

section 90 nor in section 2 of the Restatement, which defines the

word "promise," is there an explicit "requirement that the

promise giving rise to the cause of action must be so

comprehensive in scope as to meet the requirements of an offer

that would ripen into a contract if accepted by the promisee."

Hoffman v. Red Owl Stores, Inc., 133 N.W.2d 267, 275 (Wis. 1965).

In fact, the Restatement "has expressly approved" promissory

estoppel's use to protect reliance on indefinite promises.  See

Michael B. Metzger & Michael J. Phillips, Promissory Estoppel and

<u>Reliance on Illusory Promises</u>, 44 Sw. L.J. 841, 842 (1990). <u>But see</u> Alan Schwartz & Robert E. Scott, <u>Precontractual Liability and Preliminary Agreements</u>, 120 Harv. L. Rev. 661, 669-70 (2007) ("To the contrary, the Restatement of Contracts has only one definition of a promise, and that definition applies equally to a promise that is the product of a bargained-for exchange and a promise for which enforcement is sought on the grounds of induced reliance. Thus, if <u>Hoffman</u> stands for the proposition that a commitment can be binding under a theory of promissory estoppel even though it lacks the clarity and certainty required of a bargained-for promise, the case is wrong as a matter of doctrine.").

Massachusetts's continued insistence that a promise be definite - at least to a degree likely not met in the present case - is arguably in tension with its adoption of the Restatement's more relaxed standard. This tension is not irreconcilable, however. Tracing the development of promissory estoppel through the case law reveals a willingness on courts' part to enforce even an indefinite promise made during preliminary negotiations where the facts suggest that the promisor's words or conduct were designed to take advantage of the promisee. The promisor need not have acted fraudulently, deceitfully, or in bad faith. <u>McLearn</u> v. <u>Hill</u>, 276 Mass. 519, 524-25 (1931). Rather, "[f]acts falling short of these elements

may constitute conduct contrary to general principles of fair dealing and to the good conscience which ought to actuate individuals and which it is the design of courts to enforce."

Id. at 524. As the Supreme Judicial Court remarked in an early promissory estoppel case:

> [I]t is not essential that the representations or conduct giving rise to [the doctrine's] application should be fraudulent in the strictly legal significance of that term, or with intent to mislead or deceive; the test appears to be whether in all the circumstances of the case conscience and duty of honest dealing should deny one the right to repudiate the consequence of his representations or conduct; whether the author of a proximate cause may justly repudiate its natural and reasonably anticipated effect; fraud, in the sense of a court of equity, properly including all acts, omissions, and concealments which involve a breach of legal or equitable duty, trust, or confidence, justly reposed, and are injurious to another or by which an undue and unconscientious advantage is taken of another.

Id. at 525 (quoting Howard v. West Jersey & Seashore R.R., 141 A. 755, 757 (N.J. Ch. 1928), aff'd, 144 A. 919 (N.J. 1929)).

Typically, where the Massachusetts courts have applied the doctrine of promissory estoppel to enforce an otherwise unenforceable promise, "there has been a pattern of conduct by one side which has dangled the other side on a string." Pappas Indus. Parks, Inc. v. Psarros, 24 Mass. App. Ct. 596, 598 (1987) (citing Greenstein v. Flatley, 19 Mass. App. Ct. 351, 352-54 (1985); Loranger Constr. Corp. v. E.F. Hauserman Co., 6 Mass. App. Ct. 152, 154-59 (1978), aff'd, 376 Mass. at 759-61; Cellucci v. Sun Oil Co., 2 Mass. App. Ct. 722, 725-28 (1974), aff'd, 368

Mass. 811 (1975)).  In <u>Greenstein</u>, where a landlord submitted a
lease to a prospective tenant and then strung him along for more
than four months before repudiating the lease he had submitted,
the Massachusetts Appeals Court concluded that the conduct of the
landlord "was calculated to misrepresent the true situation to
the [tenant], keep him on a string, and make the [tenant]
conclude - reasonably - that the deal had been made and that only
a bureaucratic formality remained."  19 Mass. App. Ct. at 356.
Because this conduct "was misleading, it fit[] comfortably
'within at least the penumbra of some common-law, statutory, or
other established concept of unfairness.'"  <u>Id.</u> (quoting <u>PMP
Assocs., Inc.</u> v. <u>Globe Newspaper Co.</u>, 366 Mass. 593, 596 (1975));
<u>see</u> Avery Katz, <u>When Should an Offer Stick?  The Economics of
Promissory Estoppel in Preliminary Negotiations</u>, 105 Yale L.J.
1249, 1254 (1996) ("The doctrine of promissory estoppel is
commonly explained as promoting the same purposes as the tort of
misrepresentation: punishing or deterring those who mislead
others to their detriment and compensating those who are
misled.").  While <u>Greenstein</u> presented a situation ripe for a
straightforward application of promissory estoppel, the court
noted that "[i]t is not even necessary that the conduct
complained of fit into a precise tort or contract niche" for
relief to be appropriate.  19 Mass. App. Ct. at 356 (citing
<u>Slaney</u> v. <u>Westwood Auto, Inc.</u>, 366 Mass. 688, 693 (1975)).

The circumstances of the McLearn case, quoted from above, are also instructive. See 276 Mass. 519. There, after the plaintiff timely filed his tort claim in a municipal court, the defendant convinced him to dismiss it and refile in the Superior Court, where a number of other lawsuits arising from the same motor vehicle accident were pending a consolidated trial. Id. at 521. But, in so doing, the plaintiff's second action was filed after the one-year statute of limitations had run, and the defendant promptly asserted this as a defense. Id. at 521-22. The defendant had not expressly promised not to plead the statute of limitations, but the court deemed it "a necessary implication," as "the arrangement suggested by the defendant could be carried out only by not pleading the statute." Id. at 527. The court observed that "the plaintiff ha[d] suffered direct harm brought about by conduct of the defendant when he discontinued an action seasonably brought to enforce his claim; and the defendant ha[d] acquired the direct advantage of being enabled to interpose a defence resting on that conduct alone." Id. at 526. Having acted in a manner "not consonant with fairness and designed to induce action by the plaintiff to his harm," the defendant was estopped from raising the statute as a defense. Id. at 527.

One final case, the core allegations of which mirror those presented in the Dixons' complaint, merits mention. In Cohoon v.

Citizens Bank, No. 002774, 2000 WL 33170737 (Mass. Super. Nov. 11, 2000) (Agnes, J.), the parties orally agreed to a discounted payoff in full satisfaction of the plaintiff's original mortgage obligation. Id. at *1. The defendant encouraged the plaintiff to default on a mortgage payment to ensure approval of the discounted payoff. Id. at *4. Until that time, the plaintiff had made timely payments. Id. Once in default, however, the defendant sold the note to a buyer who promptly commenced foreclosure. Id. The court upheld the plaintiff's claim for promissory estoppel because, "[t]aking the facts in the light most favorable to the plaintiff, it could be found that [the defendant] encouraged [the plaintiff] to delay mortgage payment and, as a result of that reliance, the eventual buyer . . . took advantage of [the plaintiff's] vulnerable state by initiating foreclosure on [the plaintiff's] property interest." Id. While the court indicated that, to prevail at trial, the plaintiff would need to establish that he "was misled or induced to believe that by defaulting he would achieve the discounted purchase of the note that he was seeking," id. at *6, he was at least entitled to "th[is] opportunity to prove facts in support of his claim of detrimental reliance," id. at *4.

In the present case, Wells Fargo convinced the Dixons that to be eligible for a loan modification they had to default on their payments, and it was only because they relied on this

representation and stopped making their payments that Wells Fargo
was able to initiate foreclosure proceedings.  While there is no
allegation that its promise was dishonest, Wells Fargo distinctly
gained the upper hand by inducing the Dixons to open themselves
up to a foreclosure action.  In specifically telling the Dixons
that stopping their payments and submitting financial information
were the "steps necessary to enter into a mortgage modification,"
Wells Fargo not only should have known that the Dixons would take
these steps believing their fulfillment would lead to a loan
modification, but also must have intended that the Dixons do so.
The bank's promise to consider them for a loan modification if
they took those steps necessarily "involved as matter of fair
dealing an undertaking on [its] part not to [foreclose] based
upon facts coming into existence solely from" the making of its
promise.  McLearn, 276 Mass. at 523-24; see Aceves, 120 Cal.
Rptr. 3d at 514 ("U.S. Bank agreed to 'work with [Aceves] on a
mortgage reinstatement and loan modification' if she no longer
pursued relief in the bankruptcy court. . . . [This promise]
indicates that U.S. Bank would not foreclose on Aceves's home
without first engaging in negotiations with her to reinstate and
modify the loan on mutually agreeable terms."); cf. Vigoda v.
Denver Urban Renewal Auth., 646 P.2d 900, 905 (Colo. 1982)
(ruling that the plaintiff's allegation that she incurred losses
in reasonable reliance on the defendant's promise to negotiate in

good faith was sufficient to state a claim for relief). Wells Fargo's decision to foreclose without warning was unseemly conduct at best. In the opinion of this Court, such conduct presents "an identifiable occasion for applying the principle of promissory estoppel." Greenstein, 19 Mass. App. Ct. at 356-57.

As the cases reveal, where, like here, the promisor opportunistically has strung along the promisee, the imposition of liability despite the preliminary stage of the negotiations produces the most equitable result. This balancing of the harms "is explicitly made an element of recovery under the doctrine of promissory estoppel by the last words of [section 90 of the Restatement], which make the promise binding only if injustice can be avoided by its enforcement." Metzger & Phillips, supra at 849. Binding the promisor to a promise made to take advantage of the promisee is also the most efficient result. Cf. Richard Craswell, Offer, Acceptance, and Efficient Reliance, 48 Stan. L. Rev. 481, 538 (1996). In cases of opportunism, "[the] willingness to impose a liability rule can be justified as efficient since such intervention may be the most cost-effective means of controlling opportunistic behavior, which both parties would seek to control ex ante as a means of maximizing joint gains. Because private control arrangements may be costly, the law-supplied rule may be the most effective means of controlling opportunism and maximizing joint gain." Juliet P. Kostritsky,

*The Rise and Fall of Promissory Estoppel or Is Promissory Estoppel Really as Unsuccessful as Scholars Say It Is: A New Look at the Data*, 37 Wake Forest L. Rev. 531, 574 (2002); *see* Katz, *supra* at 1309 (contending that promissory estoppel can help "regulat[e] the opportunistic exercise of bargaining power" during preliminary negotiations); Schwartz & Scott, *supra* at 667 (remarking that protecting the party who has relied "will deter some strategic behavior").

There remains the concern that, by imposing precontractual liability for specific promises made to induce reliance during preliminary negotiations, courts will restrict parties' freedom to negotiate by reading in a duty to bargain in good faith not recognized at common law. While this concern does not fall on deaf ears, it can be effectively minimized by limiting the promisee's recovery to his or her reliance expenditures. *See* Farnsworth, *supra* at 267 (remarking that, where relief involves an award of reliance damages only, courts need not be troubled by "the indefiniteness of the concept of fair dealing"); Metzger & Phillips, *supra* at 853-54 (commenting that "reliance-based damage awards may sometimes be preferable in promissory estoppel cases" because, where the promise is indefinite, specific performance or expectation damages are not possible); Schwartz & Scott, *supra* at 667 (stating that, while the emerging legal rule requiring parties to bargain in good faith but not requiring them to reach

an agreement is "a step in the right direction," "efficiency would be enhanced if the law were simply to protect the promisee's reliance interest"); see also Restatement (Second) of Contracts § 90 ("The remedy granted for breach may be limited as justice requires."). See generally L.L. Fuller & William R. Perdue, Jr., The Reliance Interest in Contract Damages (Part I), 46 Yale L.J. 52 (1936). "Because promissory estoppel allows a reliance-based damage recovery in appropriate cases, it provides courts an alternative to forcing an unjustly terminated party into an unpromising relationship." Metzger & Phillips, supra at 888; see Bebchuk & Ben-Shahar, supra at 451-52 (contending that, by imposing "an interim measure of liability, extending only to reliance investments," courts need not "make the contract for the parties").

Moreover, because the promisee's reliance must be not only reasonable and foreseeable but also detrimental, such that injustice would result if the promise were not binding, "the doctrine renders the motive of the promisor a secondary consideration in deciding whether to award relief." Metzger & Phillips, supra at 888. Although some sense that the promisor has acted to take unfair advantage of the promisee is typically what prompts courts to enforce promises made during preliminary negotiations, the foreseeability and injustice requirements of section 90 render inquiry into whether the promisor acted in bad

faith unnecessary, which, in turn, obviates any need to impose a precontractual duty to negotiate in good faith.[1] See id. at 873 (referring to promissory estoppel as "superior to good faith as a device for protecting reliance"). It is also worth noting that "few claims that arise are fairly treated under the existing grounds of . . . [a] specific promise [made during negotiations]. As long as these grounds are not often invoked and have not been pushed to their limits, there will be little pressure to add a general obligation of fair dealing." Farnsworth, supra at 242.

Finally, contrary to the conventional wisdom that precontractual liability unduly restricts the freedom to

---

[1] While the law does not recognize a duty to negotiate in good faith, at least one scholar has argued that, where the parties to an agreement take it upon themselves to negotiate a modification of that agreement, "they are bound by a duty of fair dealing imposed by their existing agreement and do not enjoy the freedom of the regime of negotiation." Farnsworth, supra at 244; see also Restatement (Second) of Contracts § 205, comment (c). But see Burton & Andersen, supra § 8.5.4, at 384 (stating that most courts have "decline[d] to impose obligations concerning revision or renewal merely because the parties already have a contract between them"). Furthermore, Massachusetts law imposes on mortgage holders seeking to foreclose an obligation to "act in good faith and . . . use reasonable diligence to protect the interests of the mortgagor." U.S. Bank Nat'l Ass'n v. Ibanez, 458 Mass. 637, 647 n.16 (2011) (quoting Williams v. Resolution GGF OY, 417 Mass. 377, 382-83 (1994)).
The Dixons have not alleged that a duty of good faith governed their negotiations with Wells Fargo over a loan modification, and thus this Court need not address the issue. The fact that the parties already were bound to the special contractual relationship of mortgagor-mortgagee, however, lends support to today's conclusion that Wells Fargo's conduct, at a minimum, was "shabby and doubtless would not be followed by conscientious mortgagees." Williams, 417 Mass. at 385.

negotiate, a default rule allowing recovery but limiting it to reliance expenditures may in fact promote more efficient bargaining. See Bebchuk & Ben-Shahar, supra at 457; Schwartz & Scott, supra at 690. "[T]he existence of liability does not chill the parties' incentives to enter negotiation," Bebchuk & Ben-Shahar, supra at 457, as "[r]ational parties will pursue efficient projects and abandon inefficient projects. . . . disagree[ing], if at all, over whether a party should be compensated for a reliance expense," Schwartz & Scott, supra at 667. It is only under the current regime of either no liability or strict liability that negotiating parties are discouraged from making early and "exploratory investments that are a necessary precondition to the later writing of efficient final contracts." Id. at 690; see Bebchuk & Ben-Shahar, supra at 457; Katz, supra at 1267. In contrast, a scheme of reliance-only precontractual liability makes negotiations more desirable by inducing optimal-level commitment from each party. See Bebchuk & Ben-Shahar, supra at 457. Certainly, enforcement of specific promises made to induce reliance during preliminary negotiations "might sometimes work an injustice on promisors." Metzger & Phillips, supra at 851; see Katz, supra at 1273. But reliance-based recovery in such instances offers the most equitable and efficient result without "distort[ing] the incentives to enter negotiations" in the first place. Bebchuk & Ben-Shahar, supra at

457.

This Court, therefore, holds that the complaint states a
claim for promissory estoppel: Wells Fargo promised to engage in
negotiating a loan modification if the Dixons defaulted on their
payments and provided certain financial information, and they did
so in reasonable reliance on that promise, only to learn that the
bank had taken advantage of their default status by initiating
foreclosure proceedings.  Assuming they can prove these
allegations by a preponderance of the evidence, their damages
appropriately will be confined to the value of their expenditures
in reliance on Wells Fargo's promise.[2]

---

[2] The Court need not decide at this early juncture what the
measurement of the Dixons' reliance damages would be were they to
prevail at trial.  A balancing of the equities, however, would
seem to weigh in favor of limiting recovery to the detriment
sustained.  As the Texas Supreme Court said in Wheeler v. White,
398 S.W.2d 93 (Tex. 1966):

> Where the promisee has failed to bind the promisor to a
> legally sufficient contract, but where the promisee has
> acted in reliance upon a promise to his detriment, the
> promisee is to be allowed to recover no more than
> reliance damages measured by the detriment sustained.
> Since the promisee in such cases is partially responsible
> for his failure to bind the promisor to a legally
> sufficient contract, it is reasonable to conclude that
> all that is required to achieve justice is to put the
> promisee in the position he would have been in had he not
> acted in reliance upon the promise.

Id. at 97.  The Dixons allege that, before Wells Fargo's promise
induced them to stop making their payments, they were not in
default.  Returning their loan to non-default status would put
them back in their previous position.  By the same reasoning,
they would be required to resume their mortgage payments in their
original amount, with the missed payments being added into the

Without question, this is an uncertain result.  But the "type of life-situation" out of which the Dixons' case arises - a devastating and nationwide foreclosure crisis that is crippling entire communities - cannot be ignored.  Karl N. Llewellyn, Jurisprudence Realism in Theory and Practice 219-20 (1962). Distressed homeowners are turning to the courts in droves, hoping for relief for what they perceive as misconduct by their mortgage lenders.  Many of these cases are factually similar, if not identical to, the Dixons' case.  Yet, with the notable exception of three Massachusetts federal district court cases,[3] virtually

_____

loan balance amortized over the life of the loan.  If the Dixons were unable to resume their payments, Wells Fargo could then proceed in foreclosure.  But all of this remains speculative; assuming liability, the evidence presented at trial will no doubt illuminate the proper measure of reliance damages that the Court ought fashion.  See Fuller & Perdue, supra at 53 (commenting that, "when courts work on the periphery of existing doctrine," it becomes "obvious" that the "the process of 'measuring' and 'determining' [damages] is really a part of the process of creating them").

[3] In In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig., No. 10-md-02193-RWZ, 2011 WL 2637222 (D. Mass. July 6, 2011) (Zobel, J.), several individual mortgagors brought putative class actions against Bank of America, N.A. ("BOA"), and its subsidiary, BAC Home Loans Servicing, LP ("BAC"), alleging that the defendants improperly administered the federal Home Affordable Loan Modification Program ("HAMP").  Id. at * 1.  The plaintiffs all obtained home mortgage loans from BAC, on which they later defaulted.  Id.  To avoid foreclosure, they sought to participate in HAMP.  Id.
Pursuant to HAMP, BAC entered into a standard agreement with some of the plaintiffs for a temporary trial modification of their loan.  Id. at *1-2.  Under this Temporary Period Plan ("TPP"), each homeowner made reduced mortgage payments based on his or her financial eligibility.  Id. at *1.  The TPP promised that, by complying with its terms for three months, the homeowner

would receive a permanent HAMP modification on those same terms. Id. Despite the plaintiffs' compliance with all of the TPP's terms, they never received a permanent loan modification or a written notice that their request for a permanent modification had been denied. Id. at *2.

As to these plaintiffs, the court upheld their claims for breach of contract or, in the alternative, promissory estoppel as sufficiently alleged. Id. at *3-4. With respect to the promissory estoppel claim in particular, the court rejected the defendant's argument that "no plaintiff could reasonably have relied on a promise in the TPP to modify his or her loan because the TPP contained numerous conditions precedent which plaintiffs failed to perform." Id. at *4. Not only had the plaintiffs "meticulously" alleged their compliance with all of the conditions precedent, but also the existence of conditions had no effect on the reasonableness of the plaintiffs' reliance. Id.

Similarly, in Bosque v. Wells Fargo Bank, N.A., 762 F. Supp. 2d 342, 351 (D. Mass. 2011) (Saylor, J.), the plaintiffs signed a TPP with Wells Fargo, but alleged that the bank never offered them a permanent loan modification. Id. at 345. The plaintiffs argued that their compliance with the terms of the TPP "entitled [them] to either (1) a new contract with a permanent loan modification or (2) a decision on whether plaintiffs are entitled to the permanent modification by the modification effective date stated in the TPP." Id. at 352. The court acknowledged the internal inconsistency of the TPP as to whether loan servicers retained discretion to deny homeowners who comply with its terms a permanent modification. Id. at 352 & n.12. The court held, however, that this issue was "better resolved at a later stage of the proceedings," id. at 352 n.12, and that the complaint sufficiently alleged a claim for breach of contract or, alternatively, promissory estoppel, id. at 352-53.

Finally, in Durmic v. J.P. Morgan Chase Bank, NA, No. 10-CV-10380-RGS, 2010 WL 4825632 (D. Mass. Nov. 24, 2010) (Stearns, J.), the plaintiffs entered into a TPP with their loan servicer, J.P. Morgan Chase Bank, NA ("Chase"), and made the required payments, but never received a permanent loan modification. Id. at *2. Among other remedies, the plaintiffs sought specific performance of Chase's alleged contractual obligations. Id. at *2. Chase moved to dismiss the complaint for failure to state a claim. Id. at *1. The court denied the motion, ruling that even if the TPP were but a mere promise to provide a loan modification in the future conditioned on the plaintiff's compliance with certain terms, the allegations were sufficient to state a claim for breach of contract or promissory estoppel as an alternative theory of recovery. Id. at *2-5. The court noted that the real

no other court has upheld a claim for promissory estoppel

premised on such facts.[4]

---

question was whether the parties intended to be bound by the TPP, an issue that "[could not] be resolved in the context of a motion to dismiss." Id. at *4.

    These three cases are distinct from the present one, in that they each concerned the TPP under HAMP, which at least looks like a contract. But, as Bosque indicated, the TPP is not necessarily clear as to a loan servicer's obligations under it. Must the servicer give the homeowner a permanent modification, or has it simply promised to review the homeowner's eligibility for a permanent modification if certain conditions are met? The latter scenario is analogous to the Dixons' alleged situation, even though their complaint makes no mention of the TPP or HAMP.

    In addition, my colleagues in these three cases refused to dismiss the plaintiffs' alternative claims for promissory estoppel. This suggests that even if the TPP is proved not to be an enforceable contract, relief might still be available under the theory of detrimental reliance on the promise contained in the TPP. That the exact contours of the promise were not clearly defined by the TPP was not a bar to letting these claims for promissory estoppel go forward. The Court applies this same reasoning to allow the Dixons' complaint to survive Wells Fargo's motion to dismiss.

    [4] See In re Harris, No. 10-39586, 2011 WL 2708691, at *4 (Bankr. S.D. Tex. July 11, 2011) (holding that "[a] mere promise to prepare a written contract [for a loan forbearance] is not sufficient" to state a claim for promissory estoppel); Sherman v. Litton Loan Servicing, L.P., No. 2:10cv567, 2011 WL 2634097, at *12 (E.D. Va. July 5, 2011) (concluding that the plaintiff could not assert a cause of action based on promissory estoppel because the loan servicer never made a promise to modify the plaintiff's loan); Arqueta v. J.P. Morgan Chase, No. CIV. 2:11-441 WBS GGH, 2011 WL 2619060, at *3 (E.D. Cal. June 30, 2011) (holding that, "even if the court construes plaintiff's [First Amended Complaint] as alleging an 'agreement to negotiate' a loan modification and concludes that such agreements are enforceable," the plaintiff failed to allege a clear and unambiguous promise); Brennan v. Wells Fargo & Co., No. 5:11-cv-00921 JF (PSG), 2011 WL 2550839, at *2 (N.D. Cal. June 27, 2011) ("Here, there is no allegation that Wells Fargo promised to modify the terms of Brennan's loan or to postpone foreclosure indefinitely. At most, Wells Fargo may have promised to defer foreclosure until its review of Brennan's application for a modification was complete.

From the face of the complaint, it appears that Wells Fargo
fulfilled this alleged promise."); Adams v. JPMorgan Chase Bank,
No. 1:10-CV-04226-RWS, 2011 WL 2532925, at *3 (N.D. Ga. June 24,
2011) (concluding that the lender's promise to review the
plaintiff's loan modification application "without binding itself
to a result" was "too vague and indefinite to justify reasonable
reliance" and that the plaintiff's decision to make reduced
payments, "foregoing other means to save [his] home," was not
detrimental reliance); Gill v. Wells Fargo Bank, N.A., No. 1:11-
cv-00218 OWW GSA, 2011 WL 2470678, at *5 (E.D. Cal. June 20,
2011) ("Wells Fargo's alleged promise that the repayment plan
would be in effect for three months and was still in effect is
not a promise that Plaintiffs' loan modification would be
approved."); Cade v. BAC Home Loans Servicing, LP, No. H-10-4224,
2011 WL 2470733, at *5 (S.D. Tex. June 20, 2011) ("[C]ontinuation
of payment is a pre-existing obligation and does not amount to
detrimental reliance; the Cades were bound to make mortgage
payments long before applying for HAMP consideration."); Krouse
v. BAC Home Loans Servicing, LP, No. 2:10-cv-03309-MCE-EFB, 2011
WL 2367093, at *4 (E.D. Cal. June 9, 2011) (holding that the
lender's promise of a permanent loan modification if the
plaintiffs agreed to the terms of a temporary payment plan was
not sufficiently clear and unambiguous to be enforceable);
Strupat v. Aurora Loan Servs. LLC, No. 2:11CV00279-DS, 2011 WL
2359842, at *4 (D. Utah June 9, 2011) ("The allegations do not
support a meeting of the minds, no final terms agreed to and no
promise that Plaintiff would receive a loan modification. . . .
The well pleaded facts alleged reflect simply that Aurora
considered and, for various reasons denied, Plaintiff's
application for a loan modification."); Melegrito v. CitiMortgage
Inc., No. C 11-01765 LB, 2011 WL 2197534, at *13 (N.D. Cal. June
6, 2011) ("[C]onclusory allegations about an unspecified
individual agreeing to a loan modification with unspecified terms
at some point in the unspecified future are insufficient to
permit the court to reasonably infer that CitiMortgage or CR
Title made a clear promise to modify Mr. Melegrito's loan.");
Osmond v. Litton Loan Servicing, LLC, No. 1:10-CV-11, 2011 WL
1988403, at *3 (D. Utah May 20, 2011) (concluding that, even if
the lender promised a loan modification, the plaintiff did not
undertake any action that she otherwise would not have undertaken
if there had been no promise); James v. Wells Fargo Bank, NA
Corp., No. 2:10-CV-1205 TS, 2011 WL 1874707, at *4 (D. Utah May
17, 2011) (where the HAMP Loan Trial Agreement stated that any
modification was contingent on further approval, the plaintiffs
could not meet the reasonable reliance requirement of their
promissory estoppel claim); Lund v. CitiMortgage, Inc., No. 2:10-

CV-1167 TS, 2011 WL 1873690, at *3 (D. Utah May 17, 2011) (same); In Re Salvador, No. 10-53570 JPS, 2011 WL 1833188, at *9 (Bankr. M.D. Ga. May 12, 2011) ("[T]he alleged promise to provide a loan modification was too vague to support a promissory estoppel claim."); Morales v. Chase Home Finance LLC, No. C 10-02068 JSW, 2011 WL 1670045, at *8 (N.D. Cal. Apr. 11, 2011) ("[T]here was no promise that Plaintiffs would be found eligible for permanent loan modification on which Plaintiffs could reasonably rely."); Dooms v. Federal Home Mortg. Corp., No. CV F 11-0352 LJO DLB, 2011 WL 1232989, at *10 (E.D. Cal. Mar. 31, 2011) (dismissing the plaintiff's promissory estoppel claim where "[t]he complaint merely alludes to a three-month default requirement to qualify for a loan modification. . . . and indeed reflects that she purposely stopped making legally required mortgage payments to render her unsympathetic in a court of equity"); Myrlie v. Countrywide Bank, Civil No. 09-1441 (JNE/AJB), 2011 WL 742730, at *5 (D. Minn. Feb. 23, 2011) (granting summary judgment to the lender where the plaintiff could not recall any specific terms of the loan modification agreement, did not change his position in response to the promise of a modification, and could not meet the obligations of any loan agreement); Phipps v. Wells Fargo Bank, N.A., No. CV F 10-2025 LJO SKO, 2011 WL 302803, at *12-13 (E.D. Cal. Jan. 27, 2011) (concluding that the bank's representations that it would approve the plaintiff for a loan modification "do not amount to promises not to foreclose" and that "[a]ssurances to work with [him] do not equate to a promise to support promissory estoppel"); Wankowski v. Taylor Bean & Whitaker Mortg. Corp., No. 2:10-CV-538 JCM (PAL), 2010 WL 5141745, at *3 (D. Nev. Dec. 13, 2010) (dismissing a claim for promissory estoppel where the promise not to foreclose on which the plaintiff allegedly relied occurred after the foreclosure sale took place); Prasad v. BAC Home Loan Servicing LP, CIV No. 2:10-CV-2343-FCD/KJN, 2010 WL 5090331, at *5 (E.D. Cal. Dec. 7, 2010) (finding no clear promise to modify the plaintiff's loan where the modification was conditioned on the bank's determination that the plaintiff was financially eligible); Wells v. Chase Home Finance, LLC, No. C10-5001RJB, 2010 WL 4858252, at *8 (W.D. Wash. Nov. 19, 2010) (determining that "Chase's action in informing the plaintiffs that they must be behind in their mortgage payments in order to qualify for a loan modification does not constitute a promise" under promissory estoppel and "could at most be construed as an agreement to negotiate a contract in the future should the pre-requisite condition exist"); Mehta v. Wells Fargo Bank, N.A., 737 F. Supp. 2d 1185, 1198 (S.D. Cal. 2010) (finding no meaningful forebearance in reliance on the alleged promise by the bank to postpone the foreclosure sale if the plaintiff completed and

submitted the loan modification application); Hasan v. Ocwen Loan
Servicing, LLC, No. 2:10-CV-00476-RLH, 2010 WL 2757971, at *2 (D.
Nev. July 12, 2010) (refusing to infer that the lender was liable
for the alleged misconduct where the plaintiff's assertions of a
promised loan modificaation were vague and unspecific); Mekani v.
Homecomings Fin., LLC, 752 F. Supp. 2d 785, 792 (E.D. Mich. 2010)
(holding that the correspondence between the parties "are at most
an overture to perhaps begin a dialog, but in no way constitute a
clear and definite promise to 'work with Plaintiff'" on a loan
modification); Newgent v. Wells Fargo Bank, N.A., No. 09cv1525
WQH (WMC), 2010 WL 761236, at *7 (S.D. Cal. Mar. 2, 2010) (where
the plaintiff did not allege that she "would have been successful
in delaying the foreclosure sale, renegotiating her loan, and
retaining possession of her home," she failed to "establish a
connection between her reliance on the alleged promise [to delay
the foreclosure sale if she remitted a $2,500.77 payment, which
she did,] and losing her home to sustain her claim for
estoppel"); Hepler v. Washington Mut. Bank, F.A., No. CV 07-4804
CAS (Ex), 2009 WL 1045470, at *3 (C.D. Cal. Apr. 17, 2009)
(finding no evidence to support a promissory estoppel claim where
the loan modification documents made execution of a subordination
agreement by the bank an express condition precedent that had not
been satisfied); Ellen v. F.H. Partners, LLC, No. 09-09-00310-CV,
2010 WL 4909973, at *6 (Tex. App. Dec. 1, 2010) (holding that a
loan officer's statement that the homeowners' request that the
loan not be declared in default or foreclosure until the next
note payment was due was "doable" was too vague and indefinite to
be enforceable under the theory of promissory estoppel). But see
Sato v. Wachovia Mortg., FSB, No. 5:11-cv-00810 EJD (PSG), 2011
WL 2784567, at *10 (N.D. Cal. July 13, 2011) (noting that, if the
plaintiff were to allege that Wachovia represented it would not
hold foreclosure proceedings while her loan was under review for
a modification, her promissory estoppel claim would survive);
Ramirez v. Wells Fargo Bank, N.A., No. C 10-05874 WHA, 2011 WL
1585075, at *5 (N.D. Cal. Apr. 27, 2011) (holding that Wells
Fargo's promise to postpone a foreclosure sale due to ongoing
loan modification processing was enforceable under the theory of
promissory estoppel where the plaintiff, in reliance on the
promise, did not file a bankruptcy petition or civil action
seeking a temporary restraining order); Aceves, 120 Cal. Rptr. 3d
at 514-18 (concluding that the complaint stated a claim for
promissory estoppel where the bank promised to work with the
plaintiff to reinstate and modify her loan, giving her "a
compelling reason to opt for negotiations with the bank instead
of seeking bankruptcy relief," which offered the chance only to
reinstate, not modify, the loan); Garcia v. World Sav., FSB, 107

To the extent that today's result is an anomaly, this Court

has sought to explain its decision "openly and with respect for

precedent, not by sleight of hand."  David L. Shapiro, <u>Mr.

Justice Rehnquist: A Preliminary View</u>, 90 Harv. L. Rev. 293, 355

(1976); <u>see</u> Robert E. Keeton, Keeton on Judging in the American

Legal System 5 (1999) ("Judging is choice. . . . Judicial choice,

at its best, is reasoned choice, candidly explained.").  It is

the view of this Court that "[f]oreclosure is a powerful act with

significant consequences," <u>Ibanez</u>, 458 Mass. at 655 (Cordy, J.,

concurring), and where a bank has obtained the opportunity to

foreclose by representing an intention to do the exact opposite -

i.e., to negotiate a loan modification that would give the

homeowner the right to stay in his or her home - the doctrine of

promissory estoppel is properly invoked under Massachusetts law

to provide at least reliance-based recovery.[5]

---

Cal. Rptr. 3d 683, 691-97 (2010) (upholding a promissory estoppel
claim where the lender allowed the foreclosure sale to go forward
despite promising to postpone it to give the plaintiffs
additional time to cure the default by refinancing another
property they owned).

[5] A federal district court may certify a question for
decision by the Supreme Judicial Court "if there are involved in
any proceeding before it questions of law of [the Commonwealth of
Massachusetts] which may be determinative of the cause then
pending in the certifying court and as to which it appears to the
certifying court there is no controlling precedent in the
decisions of [the Supreme Judicial Court]."  Mass. S.J.C. Rule
1:03, § 1 (2010).  This Court has elected not to certify the
question whether the Dixons' allegations are sufficient to state
a claim for promissory estoppel, but acknowledges that, with the
exception of <u>McLearn</u>, 276 Mass. 519, the cases relied on herein

## C. HOLA Preemption

Having concluded that the Dixons' complaint states a claim for promissory estoppel, the Court now turns to Wells Fargo's contention that this state-law cause of action is preempted by the federal statutory and regulatory scheme of HOLA.

Pursuant to the Supremacy Clause of Article VI, clause 2, of the United States Constitution, federal law preempts state law where Congress has "enact[ed] a regulatory scheme 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" SPGGC, LLC v. Ayotte, 488 F.3d 525, 530 (1st Cir. 2007) (quoting Barnett Bank of Marion Cnty., N.A. v. Nelson, 517 U.S. 25, 31 (1996)). Federal statutes and the regulations adopted thereunder have equal preemptive effect. Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153 (1982).

In 1933, Congress enacted HOLA as "a radical and comprehensive response" to the devastating effect of the Great Depression on the national housing market. Id. at 159-60 (quoting Conference of Fed. Sav. & Loan Ass'ns. v. Stein, 604

---

are primarily those of the Massachusetts Appeals and Superior Courts, not the Supreme Judicial Court. See Pappas Indus. Parks, 24 Mass. App. Ct. 596; Greenstein, 19 Mass. App. Ct. 351; Loranger Constr. Corp., 6 Mass. App. Ct. 152; Cellucci, 2 Mass. App. Ct. 722; Cohoon, 2000 WL 33170737. Should either Wells Fargo or the Dixons wish to bring a motion for certification, this Court will entertain it. Mass. S.J.C. Rule 1:03, § 2 (a question may certified "upon the motion of any party to the cause").

F.2d 1256, 1257 (9th Cir. 1979)).  At the time, roughly half of
all home loans were in default, and nearly one-fifth of the
nation's population was without access to home-financing
opportunities.  <u>See</u> <u>id.</u> at 159-60.  In passing HOLA, Congress
sought to provide emergency relief to homeowners while
simultaneously restoring public confidence in a network of
centrally regulated federal savings and loan associations.  <u>Id.</u>
at 159-61; <u>Silvas</u> v. <u>E*Trade Mortg. Corp.</u>, 514 F.3d 1001, 1004
(9th Cir. 2008).

Through HOLA, Congress created the Office of Thrift
Supervision (the "OTS")[6] and gave its director plenary authority
to regulate and govern "the powers and operations of every
Federal savings and loan association from its cradle to its
corporate grave."[7] <u>de la Cuesta</u>, 458 U.S. at 145 (quoting <u>People</u>
v. <u>Coast Fed. Sav. & Loan Ass'n</u>, 98 F. Supp. 311, 316 (S.D. Cal.

---

[6] HOLA initially established the Federal Home Loan Bank
Board to regulate the conduct of federal savings associations.
Congress replaced the Board with the OTS when it amended HOLA in
1989.  <u>See</u> 12 U.S.C. § 1462a.

[7] Federal savings banks are federal savings associations
and, as such, are subject to HOLA.  12 U.S.C. § 1464(a)(1).
National banks, on the other hand, are subject to the National
Bank Act ("NBA").  12 U.S.C. § 1 <u>et seq.</u>  The preemption analysis
under both statutes is similar, although not identical.  <u>Compare</u>
12 C.F.R. § 560.2, <u>with</u> 12 C.F.R. § 34.4.  Here, any differences
are irrelevant because, while Wells Fargo is a national bank, the
conduct at issue in this lawsuit was undertaken by Wachovia
Mortgage, which was a federal savings bank, before it merged into
Wells Fargo.  <u>See</u> Aff. Steven Chandler, Ex. F, ECF No. 1-6; Aff.
Lisa Szargowicz, Ex. G, ECF No. 1-7.

1951)); see 12 U.S.C. § 1464; 12 C.F.R. §§ 500.1(a) (giving the OTS "responsib[ility] for the administration and enforcement of [HOLA]"), 500.10 (delineating the functions of the OTS as to "charter, supervise, regulate and examine Federal savings associations"). "This is an extremely broad grant of power that provides ample authority for the [OTS] Director's efforts to enforce consistent, nationwide regulations affecting lending practices, by preempt[ion]." Flagg v. Yonkers Sav. & Loan Ass'n, FA, 396 F.3d 178, 183 (2d Cir. 2005). "The Supreme Court has stated that '[i]t would have been difficult for Congress to give the [OTS] a broader mandate." SPGGC, 488 F.3d at 535 (quoting de la Cuesta, 458 U.S. at 161).

Pursuant to this broad mandate, the OTS has promulgated extensive regulations, including two that preempt state statutory and common-law causes of action that otherwise would regulate the operations of federal savings associations. See 12 C.F.R. § 545.2 (stating that the OTS's exercise of its regulatory authority "is preemptive of any state law purporting to address the subject of the operations of a Federal savings association"); id. § 560.2 ("[The] OTS hereby occupies the entire field of lending regulation for federal savings associations. [The] OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings

associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section . . . ."). That OTS regulations are "preemptive of any state law purporting to address the subject of the operations of a Federal savings association" has been recognized by the First Circuit. SPGGC, 488 F.3d at 535 (quoting 12 C.F.R § 545.2). Moreover, courts have considered these preemptive regulations to have been enacted within the scope of the OTS's congressionally delegated authority. See, e.g., Flagg, 396 F.3d at 182-84.

The regulations set forth an analytical framework for courts to follow in determining whether a specific state law is preempted by HOLA. See 12 C.F.R. § 560.2; Lending and Investment, 61 Fed. Reg. 50951, 50966-67 (Sept. 30, 1996) (codified at 12 C.F.R. pts. 545, 560, 563, 566, 571, 590). First, a court must decide whether the law in question appears in section 560.2(b)'s illustrative list of types of state laws that are definitively preempted. 61 Fed. Reg. at 50966. These include "[t]he terms of credit, including . . . adjustments to the interest rate, balance, payments due, or term to maturity of the loan;" "[d]isclosure and advertising;" and "[p]rocessing, origination, servicing, sale or purchase of, or investment or participation in, mortgages." 12 C.F.R. § 560.2(b)(4), (b)(9),

b(10). If the law is not of a type appearing in paragraph (b) of section 560.2, the court must analyze whether the law "affects lending." 61 Fed. Reg. at 50966. If so, then it presumptively is preempted, rebuttable only if the law clearly is shown to fit within the purview of paragraph (c). Id.

Paragraph (c) lists state laws that HOLA is not presumed to preempt, including contract and commercial law, real property law, homestead laws, tort law, and criminal law. 12 C.F.R. § 560.2(c). Any other law that, in the estimation of the OTS, promotes a vital state interest and either has only an incidental effect on lending or is not otherwise contrary to the regulatory intent to "occupy the field" is also not preempted. Id. Courts, however, are to interpret paragraph (c) narrowly, with any doubt resolved in favor of preemption. 61 Fed. Reg. at 50966. As the OTS has said, "the purpose of paragraph (c) is to preserve the traditional infrastructure of basic state laws that undergird commercial transactions, not to open the door to state regulation of lending by federal savings associations." Id. A plaintiff's complaint, therefore, must be divided into claims which "fall on the regulatory side of the ledger and [those] which, for want of a better term, fall on the common law side." In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig., 491 F.3d 638, 644 (7th Cir. 2007) (Posner, J.).

The Eighth and Ninth Circuits have interpreted the OTS's

analytical framework to mean that any "state law that either on its face or as applied imposes requirements regarding the examples listed in § 560.2(b) is preempted." Casey v. Federal Deposit Ins. Corp., 583 F.3d 586, 595 (8th Cir. 2009); Silvas, 514 F.3d at 1006. In other words, "a state law that on its face is not one described in § 560.2(b) may nevertheless be preempted if, as applied, it fits within § 560.2(b)." Casey, 583 F.3d at 594. Under this "as applied" rule, only generally applicable state laws that fit within paragraph (c) without more than incidentally affecting lending are exempt from preemption. See Jones v. Home Loan Inv., FSB, 718 F. Supp. 2d 728, 734 (S.D. W. Va. 2010).

While the Sixth Circuit has addressed express preemption under paragraph (b), see State Farm Bank v. Reardon, 539 F.3d 336, 347-49 (6th Cir. 2008), the Seventh Circuit is the only other appellate court to have applied the paragraph (c) analysis, see In re Ocwen Loan Servicing, 491 F.3d at 643-44.[8] Judge

---

[8] In reaching similar conclusions with respect to the preemptive effect of HOLA on state law, the Seventh, Eighth, and Ninth Circuits all relied on an OTS opinion letter, in which the agency's chief counsel concluded that an Indiana statute prohibiting deceptive acts and practices in the course of commerce was exempt from preemption under section 560.2(c). Casey, 583 F.3d at 594 (citing Preemption of State Laws Applicable to Credit Card Transactions, OTS Legal Op., 1996 WL 767462, ¶ IIC (Dec. 24, 1996) ("1996 OTS Op."), available at http://www.ots.treas.gov/_files/56615.pdf); Silvas, 514 F.3d at 1005 n.1 (same); In re Ocwen Loan Servicing, 491 F.3d at 644 (same). The OTS determined that the law's purpose was to regulate the ethical practices of all commercial business within

Posner, writing for a three-judge panel, recognized that, while the OTS has plenary authority over federal savings banks, HOLA does not provide a private right of action to consumers, leaving them with "little recourse in disputes with federal savings banks outside of those generally applicable state laws exempted from preemption in § 560.2(c)." <u>Jones</u>, 718 F. Supp. 2d at 734 (discussing Judge Posner's opinion). The Seventh Circuit thus interpreted paragraph (c), on balance, "to mean that [the] OTS's assertion of plenary regulatory authority does not deprive persons harmed by the wrongful acts of savings and loan associations of their basic state common-law-type remedies." <u>In re Ocwen Loan Servicing</u>, 491 F.3d at 643. The court gave two examples:

> Suppose [a savings and loan association] signs a mortgage agreement with a homeowner that specifies an annual interest rate of 6 percent and a year later bills the homeowner at a rate of 10 percent and when the homeowner refuses to pay institutes foreclosure proceedings. It would be surprising for a federal regulation to forbid the homeowner's state to give the homeowner a defense based on the mortgage's breach of contract. Or if the mortgagee (or a servicer like Ocwen) fraudulently

---

the state, not to impose best practices on federal savings associations in particular. 1996 OTS Op. ¶ IIC. "[B]ecause federal thrifts are presumed to interact with their borrowers in a truthful manner, Indiana's general prohibition on deception should have no measurable impact on their lending operations." <u>Id.</u> As an agency interpretation of its governing statute and regulations, this OTS opinion and the guidance it provides with respect to HOLA preemption are entitled to deference. <u>See</u> <u>Reardon</u>, 539 F.3d at 341 n.2; <u>see also</u> <u>State Farm Bank, F.S.B.</u> v. <u>Burke</u>, 445 F. Supp. 2d 207, 215-16 (D. Conn. 2006) (citing <u>Auer</u> v. <u>Robbins</u>, 519 U.S. 452, 461 (1997)).

> represents to the mortgagor that it will forgive a
> default, and then forecloses, it would be surprising for
> a federal regulation to bar a suit for fraud. Some
> federal laws do create such bars, notably ERISA, but this
> is recognized as exceptional. Enforcement of state law
> in either of the mortgage-servicing examples above would
> complement rather than substitute for the federal
> regulatory scheme.

Id. at 643-44 (internal citations omitted). If states could not

provide protection to consumers through traditional state-law

causes of action with only incidental effect on lending, then

federal savings associations effectively could "use preemption as

a shield to avoid adherence" to the commitments they make to

their customers. McAnaney v. Astoria Fin. Corp., 665 F. Supp. 2d

132, 164 & n.36 (E.D.N.Y. 2009); see Binetti v. Washington Mut.

Bank, 446 F. Supp. 2d 217, 219 (S.D.N.Y. 2006) (expressing

concern that "the Bank would be completely insulated from

liability for its breach [of contract] if the Court were to find

plaintiff's claim preempted").

At the same time, courts must be wary of artfully pleaded

attempts to use common-law claims as a clandestine way of

imposing requirements on lenders that states otherwise could not

enact through legislation or regulation. McAnaney, 665 F. Supp.

2d at 169 n.39. Courts must look beyond "the label given to the

putative cause of action," Schilke v. Wachovia Mortg., FSB, 758

F. Supp. 2d 549, 557 (N.D. Ill. 2010), and instead undertake "an

independent fact-intensive inquiry into the substance of each

claim raised," Bishop v. Ocwen Loan Servicing, LLC, Civ. No.

3:10-0468, 2010 WL 4115463, at *4 (S.D. W. Va. Oct. 19, 2009).

See Watkins v. Wells Fargo Home Mortg., 631 F. Supp. 2d 776, 782-83 (S.D. W. Va. 2008) ("If the plaintiff truly complains of a term or practice outside the purview of the federal regulations, there is no preemption. However, conflicting state regulation masquerading as a common law contract claim cannot be allowed to supplant existing federal regulations."). The question is one of function, not theory: will enforcement of the cause of action interfere with or contravene lending, the regulation of which Congress has committed exclusively to a federal agency? See Naulty v. GreenPoint Mortg. Funding, Inc., Nos. C 09-1542 MHP, C 09-1545 MHP, 2009 WL 2870620, at *4 (N.D. Cal. Sept. 3, 2009). "[I]f the conduct complained of . . . falls within the scope of federal authority concerning lending activities, it is preempted." Schilke, 758 F. Supp. 2d at 557; see Gibson v. World Sav. & Loan Assoc., 128 Cal. Rptr. 2d 19, 27 (Cal. Ct. App. 2002) ("As to each state law claim, the central inquiry is whether the legal duty that is the predicate of the claims constitutes a requirement or prohibition of the sort that federal law expressly preempts."). This functional analysis is consistent with the "as applied" rule of the Eighth and Ninth Circuits as well as the balancing approach of the Seventh Circuit. See Coffman v. Bank of Am., NA, No. 2:09-00587, 2010 WL 3069905, at *6 (S.D. W. Va. Aug. 4, 2010) ("[B]oth approaches are, in essence, a method of

determining whether a plaintiff's state law claim attempts to impose requirements upon the lending activities of federal savings banks."); <u>Jones</u>, 718 F. Supp. 2d at 735 ("In <u>Casey</u>, <u>Silvas</u>, and <u>Ocwen</u>, the courts considered the specific nature of each state law claim to determine whether an allegation is a state-based cause of action or an attempt at regulation preempted by section 560.2(b).").

Here, the only claim sufficiently pleaded to survive the motion to dismiss is that of promissory estoppel. The allegations that form the basis of this claim are that (1) Wells Fargo orally promised to negotiate a loan modification agreement if the Dixons took certain steps, and (2) despite the Dixons' compliance, Wells Fargo never engaged in modifying their loan and instead initiated foreclosure proceedings. Promissory estoppel, as an alternative to a breach of contract claim, undeniably falls within the purview of traditional state law. It nonetheless may be preempted if the alleged misconduct fits into one of the categories identified in paragraph (b) or if the practical effect on lending is more than incidental under paragraph (c).

Wells Fargo argues that the Dixons' claim seeks to impose substantive requirements regarding several expressly preempted categories, specifically (1) the terms of the loan; (2) the lender's disclosure obligations; and (3) the processing, origination, servicing, or investment or participation in

mortgages.  Def.'s Mem. Supp. 11 (citing 12 C.F.R. § 560.2(b)(4),
(b)(9), (b)(10)).  The Dixons, however, do not assert that they
were entitled to a loan modification; nor do they demand that
their loan be modified in a particular way.  They acknowledge
that, at most, Wells Fargo promised to negotiate a modification,
but argue that, because they took the steps that Wells Fargo
instructed them to take, Wells Fargo cannot now deny its promise
to consider their eligibility.  This has no bearing on the terms
of any modification that the parties might negotiate in the
future.

There is some suggestion in the complaint that Wells Fargo
failed to notify the Dixons that their loan modification
application had been denied before it initiated foreclosure
proceedings.  This is tangential to the promissory estoppel
issue, however, and thus the Court need not address whether the
allegations that touch on Wells Fargo's disclosure obligations
are preempted by HOLA.

Undoubtedly, the claim that Wells Fargo failed to uphold a
promise to consider the Dixons for a loan modification relates to
Wells Fargo's "servicing" of the mortgage.  See 12 C.F.R.
§ 560.2(b)(10).  But the standard for express preemption is more
than "relates to."  See Coffman, 2010 WL 3069905, at *6 (citing
In re Ocwen Loan Servicing, 491 F.3d at 643-44).  The claim must
"purport[] to impose requirements" regarding loan servicing for

express preemption to apply.  12 C.F.R. § 560.2(b).  Here, the

Dixons do not aim to impose any substantive requirement on the

loan modification process used by Wells Fargo, in particular, or

federal savings banks, in general.  Coffman, 2010 WL 3069905, at

*9.  The promissory estoppel claim seeks not to attack Wells

Fargo's underlying loan servicing policies and practices, but

rather to hold the lender to its word, on which the Dixons relied

to their detriment.  Enforcement of Wells Fargo's promise merely

requires the lender to deal fairly and honestly, which no more

burdens those lending operations listed in paragraph (b) than it

does everyday business transactions.  Bishop, 2010 WL 4115463, at

*5 ("[R]equiring a bank to perform the obligations of its

contract in good faith implicates none of the concerns embodied

in HOLA."); see Morse v. Mutual Fed. Sav. & Loan Ass'n of

Whitman, 536 F. Supp. 1271, 1281 (D. Mass. 1982) (Aldrich, J.)

("An award of Chapter 93A exemplary damages against defendant

would no more threaten the ability of federal savings and loan

associations to perform their functions in the Commonwealth than

it would state-chartered savings and loan associations, or other

corporations subject to the statute.").  "Only claims that are

specific to a defendant's lending activities, as distinguished

from legal duties applicable to all businesses, are preempted by

HOLA."  Cuevas v. Atlas Realty/Fin. Servs., Inc., No. C 07-02814

JF, 2008 WL 268981, at *3 (N.D. Cal. Jan. 30, 2008).

Turning to paragraph (c) of section 560.2, the Dixons'
promissory estoppel claim "affect[s] lending businesses, just as
[it would] affect any other business that enters into contracts
or makes representations during the course of its operations."
Gibson, 128 Cal. Rptr. 2d at 28.  Because it has some effect on
lending, a presumption of preemption arises.  61 Fed. Reg. at
50966.  This presumption is rebutted here, however, because
promissory estoppel, as a state common-law doctrine of general
applicability, is "not designed to regulate lending and do[es]
not have a disproportionate or otherwise substantial effect on
lending."  Gibson, 128 Cal. Rptr. 2d at 28-29.  All businesses,
not just federal savings associations, are subject to the
predicate duty that the Dixons seek to enforce – a duty to honor
promises made.  Compliance with that duty would not require Wells
Fargo to alter its loan modification program, or any substantive
aspect of its approach to servicing loans, but it would ensure
that consumers like the Dixons reasonably could rely on their
lenders' statements without suffering harm as a result.

With the national housing market once again rattled by an
overwhelming number of foreclosures, other federal courts have
been grappling recently with the preemption issue in cases
factually indistinguishable from the present one.  Yet, no
consensus has emerged with respect to HOLA's reach.  In DeLeon v.
Wells Fargo Bank, N.A., No. 10-CV-01390-LHK, 2011 WL 311376 (N.D.

Cal. Jan. 28, 2011), for example, the plaintiffs had complied

with the steps required by Wells Fargo for a loan modification,

which they had been assured would be successful, when abruptly

and without warning they lost their home to foreclosure.  Id. at

*1-2.  The court held that the plaintiffs' intentional

misrepresentation claim against Wells Fargo was not preempted by

HOLA because it "d[id] not attempt to impose substantive

requirements regarding loan terms, disclosures, or servicing or

processing procedures."  Id. at *7.  Similarly, in Becker v.

Wells Fargo Bank, N.A., No. 2:10-cv-02799 LKK KJN PS, 2011 WL

1103439 (E.D. Cal. Mar. 22, 2011), where the plaintiff "allege[d]

that he was promised a modification even though [the lender]

never intended to modify his loan or seriously consider his

application," the court concluded that the "plaintiff's fraud

claim appears to arise from a more 'general duty not to

misrepresent material facts,' and therefore it does not

necessarily regulate lending activity."  Id. at *8-9.[9]  In

_____

[9] For other cases finding no preemption of common-law
claims, see, for example, Sato, 2011 WL 2784567, at *10 (stating
that simple allegations of "promises that were not kept" would
not be preempted by HOLA); Fletcher v. OneWest Bank, FSB, No. 10
C 4682, 2011 WL 2648606, at *4 (N.D. Ill. June 30, 2011)
("[W]ithout some explicit direction from Congress that it
intended programs such as HAMP to have such preemptive force, the
Court will not preclude Fletcher from pursuing her basic state
common law remedies."); Taquinod v. World Sav. Bank, FSB, 755 F.
Supp. 2d 1064, 1071-72 (C.D. Cal. 2010) (holding that the
plaintiffs' claim that their lender failed to perform under the
loan contract was not preempted by HOLA); Coffman, 2010 WL
3069905, at *9 ("Unlike plaintiff's unconscionable conduct claim,

contrast, however, the court in <u>Zarif</u> v. <u>Wells Fargo Bank, N.A.</u>,
No. 10cv2688-WQH-WVG, 2011 WL 1085660 (S.D. Cal. Mar. 23, 2011),
held that the plaintiffs' state-law claims, including intentional
misrepresentation, negligent misrepresentation, and promissory
estoppel, were preempted by HOLA because they "specifically

plaintiff's allegations of fraud do not translate into burdensome
requirements to be employed by federal savings banks during
lending.  His claim simply seeks to prevent lenders from
intentionally misrepresenting information to borrowers in a
fraudulent manner."); <u>McAnaney</u>, 665 F. Supp. 2d at 164 ("It
cannot be fairly said that the common law claim for breach of
contract, which merely seeks to make defendants live up to the
word of their agreements they sign with their customers, 'more
than incidentally affects' lending operations."); <u>Biggins</u> v.
<u>Wells Fargo & Co.</u>, 266 F.R.D. 399, 417 (N.D. Cal. 2009)
(distinguishing between allegations of inadequate disclosures of
loan terms, which are preempted, and affirmative, material
misrepresentations, which might not be preempted); <u>Alcaraz</u> v.
<u>Wachovia Mortg., FSB</u>, No. CV F 08-1640 LJO SMS, 2009 WL 160308,
at *6 (E.D. Cal. Jan. 21, 2009) (holding that the plaintiff's
causes of action sounding in contract and real property "arise
from common law, not a statute or other regulation subject to
preemption"); <u>Mincey</u> v. <u>World Sav. Bank, FSB</u>, 614 F. Supp. 2d
610, 646 (D.S.C. 2008) (holding that a "straightforward breach of
contract action" was not preempted); <u>Cuevas</u>, 2008 WL 268981, at
*3 (concluding that the lender had not met its burden regarding
preemption because the plaintiff's "claims appear to be directed
to legal requirements that are applicable to all businesses, such
as truthfully memorializing in writing what is agreed to orally
by contracting parties"); <u>Heist</u> v. <u>Eastern Sav. Bank, FSB</u>, 884
A.2d 1224, 1234-35 (Md. Ct. Spec. App. 2005) ("[N]otwithstanding
that the parties present the instant case as a question of
federal preemption, it is properly resolved as a matter of
contract law."); <u>Gibson</u>, 128 Cal. Rptr. 2d at 28-29 ("The duties
to comply with contracts and the laws governing them and to
refrain from misrepresentation . . . are principles of general
application.  They are not designed to regulate lending and do
not have a disproportionate or otherwise substantial effect on
lending."); <u>cf.</u> <u>Ramirez</u>, 2011 WL 1585075, at *7 (holding that a
claim for promissory estoppel based on Wells Fargo's promise to
postpone a foreclosure sale was not preempted by the NBA, subject
to reevaluation on a motion for summary judgment or at trial).

challenge the processing of Plaintiffs' loan modification

application and servicing of Plaintiffs' mortgage." Id. at *3.[10]

---

[10] For other cases finding preemption of common-law claims,
see, for example, Copeland-Turner v. Wells Fargo Bank, N.A., No.
CV-11-37-HZ, 2011 WL 2650853, at *8 (D. Or. July 6, 2011) ("If
plaintiff's claim alleges that Wells Fargo breached a subsequent
oral modification to the Deed of Trust, . . . the claim is
preempted because it is based on an allegation that Wells Fargo
made a particular representation in the course of servicing the
loan and regarding its secured property."); Parmer v. Wachovia,
No. C 11-0672 PJH, 2011 WL 1807218, at *1 (N.D. Cal. Apr. 22,
2011) (dismissing as preempted the plaintiff's promissory
estoppel claim based, in part, on an allegation that the lender
made misleading representations concerning a loan modification);
Down v. Flagstar Bank, F.S.B., No. 3:10-cv-847, 2011 WL 1326961,
at *6 (E.D. Va. Apr. 4, 2011) (finding the plaintiffs' fraud
claim did not fit within the preemption exemption because the
lender's representations and the loan transaction were
"inextricably linked"); Ahmad v. Wells Fargo Bank, N.A., No. CIV
S-09-1200 JAM DAD PS, 2011 WL 1260054, at *7 n.7 (E.D. Cal. Mar.
30, 2011) (noting that "common law breach of contract remedies
are likely unavailable to plaintiff in [the] mortgage loan/non-
judicial foreclosure sale context"); Dvornekovic v. Wachovia
Mortg., No. CV 10-5028RBL, 2010 WL 4286215, at *3 (W.D. Wash.
Oct. 26, 2010) (holding that it "would be a fundamental change in
the way lending associations operate" if the court were to
enforce the claim that a failure to disburse actual monetary
funds in exchange for a promissory note constitutes a breach of
contract); Jones-Boyle v. Washington Mut. Bank, FA, No. CV
08-02142 JF (PVT), 2010 WL 2724287, at *6-7 (N.D. Cal. July 8,
2010) (holding that breach of contract and implied covenant of
good faith and fair dealing claims are preempted by HOLA); Jones,
718 F. Supp. 2d at 737 (deeming the plaintiff's negligence claim
"impermissibly regulatory" where she alleged that the bank
improperly qualified her for a loan that she could not afford to
pay); Amaral v. Wachovia Mortg. Corp., 692 F. Supp. 2d 1226,
1237-38 (E.D. Cal. 2010) (finding that HOLA preempted a fraud
claim alleging that the lender made material false
representations that their refinance loan had been approved, that
all documents had been processed, and that they were obligated to
repay their loan); Lopez v. Wachovia Mortg., No. 09-CV-01510-JAM-
DAD, 2009 WL 4505919, at *4-5 (E.D. Cal. Nov. 20, 2009)
(dismissing with prejudice breach of contract and implied
covenant of good faith and fair dealing claims because they were
preempted by HOLA); Bassett v. Ruggles, No. CV-F-09-528, 2009 WL

There, like here, the plaintiffs faced foreclosure after following Wells Fargo's instruction to stop making their payments while waiting for their loan modification application to be processed.

Without guidance from another court within the First Circuit and without clear direction from other federal and state courts across the nation, this Court agrees with Judge Posner's conclusion that, especially because HOLA does not give a private right of action, Congress could not have intended to deny all traditional state-law avenues of recourse to consumers who are harmed by the unseemly conduct of lenders.  This Court,

2982895, at *22 (E.D. Cal. Sept. 14, 2009) (listing cases that "universally indicate" that, even if amended, the plaintiffs' fraud claim based on the allegation that the lender induced them to enter into a loan with a higher interest rate than they qualified for would be preempted by HOLA); Munoz v. Financial Freedom Senior Funding Corp., 573 F. Supp. 2d 1275, 1281 (C.D. Cal. 2008) (finding preemption because ratification of the plaintiff's legal theory "would dramatically affect the lending operations of federal savings associations by imposing an obligation upon them to monitor its borrower's use of loan proceeds"); Haehl v. Washington Mut. Bank, F.A., 277 F. Supp. 2d 933, 942 (S.D. Ind. 2003) ("[P]laintiffs' tort law claims seek to regulate the fees that Washington Mutual Bank, a federally-chartered savings association, can charge its customers.  A decision in plaintiffs' favor would have the same effect as a direct regulation of the fees.").  But see Thomas v. OneWest Bank, FSB, Civ. No. 10-6234, 2011 WL 867880, at *4-5 (D. Or. Mar. 10, 2011) (holding that the plaintiff's equitable estoppel and fraud claims were preempted because they "require[d] the court to look into the manner in which a federal bank marketed and processed a refinancing, which directly relates to the lending practices of federal banks," but suggesting that a breach of contract claim would not be preempted because it "would only require the court to look into the terms of the contract, and whether the bank violated those terms").

therefore, holds that the Dixons' promissory estoppel claim, rooted in the common law and with no ambition of regulating lending, is not barred by HOLA.

## III. CONCLUSION, SCHEDULING ORDER, and SOME RUMINATIONS

For the reasons discussed, the Court DENIES Wells Fargo's motion to dismiss, ECF No. 5. The facts as alleged in the complaint are sufficient to invoke the doctrine of promissory estoppel, and this common-law claim, as applied, is not preempted by federal law.

"Courts across the country are being saddled with a rapid escalation of foreclosure filings due to the fallout from the subprime mortgage crisis. Millions of homeowners stand to lose their homes in the United States . . . , and hundreds of billions of dollars in home equity will be lost as a result by all homeowners, not just those in default on their mortgages." Raymond H. Brescia, <u>Beyond Balls and Strikes: Towards a Problem-Solving Ethic in Foreclosure Proceedings</u>, 59 Case W. Res. L. Rev. 305, 305 (2009).

> Instead of abating, the foreclosure crisis has turned into an economic crisis. Today, job loss now pushes many homeowners with prime mortgages into foreclosure, while continuing market decline leaves others owing more on their mortgages than their homes are worth. Current estimates have twenty-five percent of houses 'underwater,' and some analysts predict as much as forty-eight percent of all residential properties nationwide will have a negative equity between their mortgage balances and their property values before the housing market recovers.

Robin S. Golden, <u>Building Policy Through Collaborative</u>
<u>Deliberation: A Reflection on Using Lessons from Practice to</u>
<u>Inform Responses to the Mortgage Foreclosure Crisis</u>, 38 Fordham
Urb. L.J. 733, 734 (2011) (footnotes omitted).

It is said that talk is cheap. The Dixons' allegations are
easy to make, yet until their veracity is put to the test,
foreclosure is inappropriate. But just as the homeowner ought
not suffer a wrongful foreclosure, so too the bank has an equal
and proper interest in realizing on its mortgage security by
putting the home on the market at a foreclosure sale, selling it
to a viable buyer, and <u>lending</u> the funds derived to other
potential home buyers. This case is but a microcosm of much
larger economic issues; to a significant extent, our national
economy may depend upon promptly sorting out the issues raised
here. Clogging the operation of the mortgage foreclosure system
with court delay simply will not work. Either individual rights
will be submerged, and people will lose their homes unlawfully,
or home mortgage liquidity will atrophy, the larger economy will
suffer, and potential home buyers will be denied homeownership,
although financially able to support mortgage payments.

A prompt trial of this case is thus absolutely crucial.
Here in Massachusetts, this federal district court - one of the
most productive in the country, <u>United States</u> v. <u>Massachusetts</u>,
Civil Action No. 09-11623-WGY, slip op. at chart, ECF. No. 134-1

(D. Mass. May 4, 2011) (Massachusetts is one of "America's Most
Productive federal district courts") - can provide such a
trial.[11]

---

[11] In light of the national mortgage crisis (and the
implosion of state judiciaries due to budgetary constraints, see,
e.g., Michael Levenson & Noah Bierman, Judges Vow to Shut 11
Courts, Boston Globe, July 13, 2011, at A1), it is simply
inconceivable that the United States Judicial Conference, an
unelected body that meets in private without any public input,
has chosen this moment to attempt to impair the access of the
citizens of Massachusetts to their federal district court, see
Judicial Conference of the United States, Preliminary Report:
Judicial Conference Actions 4 (March 15, 2011), in the face of a
direct congressional mandate to the contrary, see 28 U.S.C. § 133
(setting number of Massachusetts federal district court judges at
thirteen).

I am not the only one to point out the wrongheadedness of
this policy. See Lee Hammel, Panel Recommends Cutting Judge,
Worcester Telegram & Gazette, July 10, 2011, at B1; see also
United States v. Jones, 762 F. Supp. 2d 270, 282 n.10 (D. Mass.
2010) (discussing effect of policy on criminal sentencing)
(appeal pending); Saturn Mgmt. LLC v. Gem-Atreus Advisors, LLC,
754 F. Supp. 2d 272, 286 app. A (D. Mass. 2010) (Massachusetts
was fourth among the nation's district courts in number of civil
trials (9.1) per active district judge during the twelve-month
period ending September 30, 2009. The national average is 4.8
such trials.); United States ex rel. Hutcheson v. Blackstone
Med., Inc., 694 F. Supp. 2d 48, 54-56 (D. Mass. 2010) (discussing
effect of policy on interdistrict case transfer), rev'd on other
grounds, 2011 WL 2150191 (1st Cir. June 1, 2011). See generally
Marc Galanter & Angela Frozena, The Continuing Decline of Civil
Trials in American Courts (July 9, 2011) (paper delivered at
Pound Civil Justice Institute's 2011 Forum for State Appellate
Court Judges); Robert P. Burns, What Will We Lose If the Trial
Vanishes? (Northwestern Univ. Sch. Law Public Law & Legal Theory
Research Paper Series No. 11-48, 2011), available at
http://ssrn.com/abstract=1851776; Andrew Cohen, "Hot Coffee" and
the Scalding of the American Jury, The Atlantic, July 13, 2011,
http://www.theatlantic.com/entertainment/archive/2011/07/hot-
coffee-and-the-scalding-of-the-american-jury/241787/.

Can anyone explain to me how impairing the access to justice
of Massachusetts citizens improves the quality of justice
nationwide? There is not a scintilla of evidence to support such
a preposterous suggestion.

Accordingly, this case is ordered placed on the September running trial list,[12] and the parties shall be ready for trial on Tuesday, September 6, 2011.

SO ORDERED.

/s/ William G. Young
William G. Young
District Judge

---

[12] This Court's use of a "running" trial list is analyzed fully in William G. Young, <u>Vanishing Trials, Vanishing Juries, Vanishing Constitution</u>, 40 Suffolk U. L. Rev. 67, 90 (2006).